UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

BRIDGET GAUFF and
STEVEN GAUFF,

      Plaintiffs,

v.                                   **MEMORANDUM OF LAW & ORDER**
                                      Civil File No. 9-3423 (MJD/JJG)

JOHN WIMBLEY and
WIMBLEY FINANCIAL, LLC,

      Defendants.

Patrick C. Burns, Anna M. Hagstrom, Erik F. Hansen, and Nathaniel P. Hobbs, Patrick Burns & Associates, Counsel for Plaintiffs.

Brian J. Donahoe, Cutler & Donahoe, Counsel for Defendants.

## I.    INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary Judgment. [Docket No. 20] The Court heard oral argument on March 11, 2011.

## II.    SUMMARY OF THE COURT'S OPINION

The Court dismisses Plaintiffs' claims because they fail to offer competent proof of damages caused by Defendants.

## III.    BACKGROUND

1

A.   **Factual Background**

1.   **Narrative**

On November 14, 2006, married Plaintiffs Bridget Gauff and Steven Gauff entered into a construction contract with Zome's Construction, Inc., for the construction of a $600,000 home in Sioux Falls, South Dakota. The Gauffs made a $30,000 deposit towards the contract price. The construction contract provided that, if the Gauffs did not inform the builder of a failure to obtain a mortgage within 30 days from the date of the agreement, their deposit became non-refundable.

Zome's Construction provided the Gauffs with the name of Defendant John Wimbley as a mortgage broker who could assist them in applying for a loan. Minnesota resident Wimbley and his wife own Defendant Wimbley Financial, LLC, a Minnesota limited liability company.

Mr. Gauff signed a Borrower-Broker Agreement and a Mortgage Loan Origination Agreement with Wimbley Financial. Mr. Gauff's signature appears on a mortgage loan application, filled out by Defendants. The signed application listed Mr. Gauff's estimated monthly income as $15,950. According to the Gauffs, this amount substantially overstated Mr. Gauff's income.

The Gauffs testified that they believed that they were applying for a loan based on Mr. Gauff's credit score, not his income, because Mr. Gauff had not yet obtained a job in Sioux Falls so he did not have any income. They further testified that Defendants did not promise that they would be able to secure financing for the purchase of the home, and the Gauffs understood that the bank or mortgage company would need to approve the loan.

In January 2007, Wimbley Financial pre-approved the Gauffs for a first and second mortgage, subject to certain conditions and approvals. The preapproval letter stated that the final loan application was subject to rejection based on changes in cash funds, income, or credit before closing. Either the bank or Defendants provided the Gauffs with documentation regarding the proposed mortgage loan that explained the interest rate, the monthly payment, the total amount financed, and the ways the interest rate and payment could change.

The Gauffs were initially approved for a first mortgage in the amount of $495,000.00 from Wachovia Savings. They were also conditionally approved for a second mortgage for the purchase of the home that was dependent on Mr. Gauff maintaining his credit score.

In approximately March 2007, after the initial loan pre-approval, Mr. Gauff's credit score declined, and he was disqualified for the second mortgage loan program. According to Defendants, this decline was due to jewelry purchases on credit by Mr. Gauff, along with medical accounts being past due. Mr. Gauff has now submitted an affidavit stating that Wimbley made several inquiries into his credit, which, according to an unnamed source, caused his credit score to decline.

Plaintiffs claim that, throughout the loan application process, Wimbley told the Gauffs that everything was moving along and was "okay." They also claim that, along with Zome's Construction, Wimbley advised the Gauffs to move into the house before the loan was completed, because it would not be long before it was finalized, and they did so.

The Gauffs' own testimony establishes that they did know of issues with the loan application based on Mr. Gauff's credit: Wimbley advised them of the problems and worked with them to try to repair Mr. Gauff's credit. The Gauffs paid the jewelry bill to Zales and made payments on the outstanding medical bills. However, Mr. Gauff was still not able to qualify for a second mortgage.

On May 15, 2007, after the second mortgage was denied, the Gauffs signed a modified Construction Contract with Zome's, which included modifications that increased the purchase price of the house to more than $650,000. Although the Gauffs did move into the house for a period of time, they were never able to obtain financing and were unable to purchase the house.

According to Mr. Gauff, the house that the Gauffs had contracted to build eventually sold on February 29, 2008, for $69,000 more than the purchase price the Gauffs had contracted to pay.

### 2. Plaintiffs' Theory of the Case

In their representations to the Court, Plaintiffs explain their theory of the case as follows: Plaintiffs' claims are based on the Borrower Agreement, which stated that Defendants would provide loan pre-qualification services including gathering the required documentation for obtaining loan approval and submitting that information to lenders. Specifically, Plaintiffs assert that Defendants overstated Mr. Gauff's income to lenders, and this overstatement caused preliminary approval for a loan which would not have been approved had his actual income been provided. This misrepresentation caused Plaintiffs to lose the deposit that they made on the construction of the home. They further

argue that, if they had been informed, from the beginning, that they would not qualify for a sufficient loan, they would have been able to retrieve their deposit and cancel the construction contract. Additionally, Plaintiffs assert that Defendants made excessive inquiries to lenders, which caused Mr. Gauff's credit score to drop, disqualifying him from mortgage loans for the house purchase.

### B. Procedural Background

On November 13, 2009, Bridget and Steven Gauff initiated an action against Wimbley and Wimbley Financial in Dakota County court by serving a Complaint on Defendants. The Complaint alleges: Count One, Breach of Contract; Count Two, Promissory Estoppel; Count Three, Breach of Fiduciary Duty; Count Four, Breach of Covenant of Good Faith and Fair Dealing; Count Five, Violation of Uniform Deceptive Trade Practices Act; and Count Six, Negligent Representation.

On December 2, 2009, Defendants removed the case to this Court based on diversity jurisdiction. Defendants now move for summary judgment on all claims against them.

## IV.   DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  Summary judgment is only appropriate when "there is no dispute of fact and where there exists only one conclusion." Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

### B.     Proof of Damages

The Court grants summary judgment to Defendants on Counts One though Four and Count Six because, as a matter of law, Plaintiffs cannot prove damages caused by any actions by Defendants.

Plaintiffs assert four main categories of damages:

#### 1.     Mr. Gauff's Credit Score and the Ability to Obtain a Second Mortgage

The only evidence that Plaintiffs present to show that Defendants performed excessive credit inquiries on Mr. Gauff, thereby lowering Mr. Gauff's credit score and causing him to be rejected for the pre-approved loan and any subsequent loan application, is the following sentence in Mr. Gauff's affidavit:

7

"We were advised that the decrease in my credit score was due to the number of credit inquiries made by Mr. Wimbley, not to any purchase at Zales as Mr. Wimbley alleges." (S. Gauff Aff. ¶ 8.) This allegation was not testified to in the Gauffs' depositions. This statement in the affidavit does not identify who told this information to Mr. Gauff or the basis for the conclusion. It is hearsay and is completely lacking a factual basis. The statement also fails to allege when Mr. Gauff's credit score was lowered by Wimbley's actions – before or after he was rejected for the second mortgage. The allegation is inadmissible. Without this statement, Plaintiffs have no proof of any damage to Mr. Gauff's credit score caused by Defendants.

There is also no other evidence that Defendants' misrepresentation of Mr. Gauff's income had any effect on his ability to obtain the pre-approved second mortgage. While common sense would indicate that an accurate representation of income should be important to a loan decision, there is no evidence in the record from which a jury could conclude that the misstatement of the Gauffs' monthly income either caused the original pre-approval or had any effect on the subsequent denial for the pre-approved second mortgage or any other mortgage.

The only evidence in the record is that Mr. Gauff lost the second mortgage because his credit score declined.

Plaintiffs have presented absolutely no admissible evidence – expert or otherwise – to support the conclusion that Defendants' inflated income representation or credit inquiries had any impact on Plaintiffs' ability to obtain a loan or on Mr. Gauff's credit score.

### 2. Relocation to South Dakota and the Construction Deposit

Plaintiffs claim damages from relocating from New Orleans to South Dakota. In Mr. Gauff's affidavit, he states that his family relied on Defendants' falsely obtained loan preapproval to relocate from New Orleans; however, this vague statement is completely contradicted by Mr. Gauff's clear deposition testimony and the evidence in the record. Plaintiffs entered into the contract to build the Sioux Falls home in November 2006. At that time, Ms. Gauff and their children had already relocated to Sioux Falls, and Mr. Gauff was in the process of permanently relocating to Sioux Falls. Ms. Gauff and the Gauffs' children relocated to South Dakota in 2005. Mr. Gauff testified that they relocated to Sioux Falls from New Orleans because of Hurricane Katrina, because the base he was working on was slated to be closed, and because they had family living

there. The loan preapproval from Defendants came more than a month after the Gauffs had already signed the construction contract for the Sioux Falls house. Therefore, the record cannot support a claim that Defendants' misstatement of Mr. Gauff's income resulted in a faulty preapproval that influenced Plaintiffs to relocate to South Dakota.

Additionally, Plaintiffs signed the construction contract on the home on November 14, 2006, with a 30-day right to cancel if a mortgage was not obtained, and the loan application with the allegedly false income information bears a signature date of January 2007, as does the preapproval letter. Therefore, by the time Defendants allegedly misrepresented Plaintiffs' income, Plaintiffs had already signed the construction contract and lost the ability to cancel the construction contract and receive their down payment back. Moreover, Plaintiffs signed the new construction agreement, increasing the purchase price of the house to more than $650,000, <u>after</u> Mr. Gauff's credit score dropped and they had been rejected for the second loan.

The Gauffs also argue that, if Defendants had informed them from the beginning that they would not qualify for a loan of the amount sought based on their actual income, they would have been able to retrieve their deposit and

cancel the construction contract. However, there is no evidence to support the theory that they could not qualify for the financing they needed because of their actual income, rather than because Mr. Gauff's credit score fell, and there is no evidence that Defendants caused the decline in Mr. Gauff's credit score.

### 3. Moving into and out of the Sioux Falls House

After Defendants allegedly misrepresented Mr. Gauff's income, Plaintiffs moved into the home without an approved mortgage. However, Mr. Gauff testified that, until the closing of the home, Plaintiffs knew that they could not rely that the financing would be available and that the home would be theirs. Additionally, Plaintiffs have submitted no evidence of any particular damages caused by this action.

The Court further notes that there is no evidence that Plaintiffs ever closed on a loan for the Sioux Falls house, so they never had to make any mortgage payments. They can point to no damages in this regard.

### 4. Sale Price of the Sioux Falls House

Finally, the eventual sale of the home by the builder in February 2008, for $69,000 more than Plaintiffs' contract price with the builder, is too uncertain a basis for damages. Any potential gain to the Gauffs is speculative. "To prove

damages, [a plaintiff] must demonstrate by a preponderance of evidence that: "(a) profits were lost, (b) the loss was directly caused by the breach . . ., and (c) the amount of such causally related loss is capable of calculation with reasonable certainty rather than benevolent speculation." Hinz v. Neuroscience, Inc., 538 F.3d 979, 984 (8th Cir. 2008) (citation omitted).

    First, Plaintiffs cannot show that any action by Defendants caused Plaintiffs to fail to qualify for financing for the house.  Second, Plaintiffs offer no evidence that they would have sold the house in February 2008.  Nor do they offer any evidence that the price of the house would have been that high at some other date on which they might have sold the house.  Such evidence would be particularly necessary in today's economy where, in fact, many housing prices have declined since February 2008.  Third, Plaintiffs provide no details regarding the sale by the builder, so there is no way to determine if a private seller of a lived-in (and therefore, not new) house could have sold the house for the same price as the builders sold the house as new construction.

    In sum, there is no evidence of damages to Plaintiffs caused by Defendants.

### 5. Damages Requirement for Relevant Counts

Counts One through Four and Count Six all require proof of damages, which Plaintiffs cannot supply.

As to Count One, "[l]iability for breach of contract requires proof that damages resulted from or were caused by the breach." Border State Bank of Greenbush v. Bagley Livestock Exchange, Inc., 690 N.W.2d 326, 336 (Minn. Ct. App. 2004).

As to Count Two, Promissory Estoppel, successful plaintiffs must demonstrate some detriment – damage – caused by their reliance on defendants' promise.  See Kreitzer v. Xethanol Corp., Civil No. 08-14 (DSD/JJK), 2009 WL 113373, at *4 (D. Minn. Jan. 16, 2009).  See also Martens v. Minn. Min. & Mfg. Co., 616 N.W.2d 732, 746 (Minn. 2000) (holding that a successful claim for promissory estoppel "requires proof that . . . the promisor intended to induce reliance and the promisee in fact relied to his or her detriment") (citation omitted).

As to Count Three, to succeed on a claim for breach of fiduciary duty, a plaintiff must prove the existence of damages.  See Padco, Inc. v. Kinney & Lange, 444 N.W.2d 889, 891 (Minn. Ct. App. 1989) (providing that breach of fiduciary duty claim has same elements as negligence claim); Hudson v. Snyder

Body, Inc., 326 N.W.2d 149, 157 (Minn. 1982) (identifying negligence elements, including proof of injury – i.e., damages).

As to Count Four, Minnesota does not recognize a cause of action for a breach of the implied covenant of good faith and fair dealing independent from the underlying a breach of contract claim.  See Orthomet, Inc. v. A.B. Med., Inc., 990 F.2d 387, 392 (8th Cir. 1993).  Plaintiffs' claim for breach of contract is identical to their claim for breach of good faith and fair dealing, which fails for lack of causation of damages.  Also, failure to prove damages is fatal to a claim for breach of implied covenant of good faith and fair dealing.  See Enduracon Techs., Inc. v. Northshore Min. Co., No. A09-2332, 2010 WL 3854336, at *7 (Minn. Ct. App. Oct. 5, 2010) (unpublished) (holding that, because good faith claim is dependent on breach of contract claim, failure to prove damages is fatal to claim for breach of covenant of good faith and fair dealing).

As to Count Six, negligent representation requires proof of damages caused by the negligent misrepresentation.  See Hurley v. TCF Banking & Sav., F.A., 414 N.W.2d 584, 586 (Minn. Ct. App. 1987).

Therefore, because Plaintiffs cannot show damages caused by Defendants, summary judgment is required on Counts One, Two, Three, Four, and Six.

### C. Uniform Deceptive Trade Practices Act Claim

In Count Five, Plaintiffs allege that Defendants violated subdivision 1(9) of the Minnesota Deceptive Trade Practices Act ("MDTPA"), which provides that "a person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person . . . advertises goods or services with intent not to sell them as advertised." Minn. Stat. § 325D.44, subd. 1(9).

A plaintiff seeking damages, rather than injunctive relief, under the MDTPA, must prove actual injury. See LensCrafters, Inc. v. Vision World, Inc., 943 F. Supp. 1481, 1489 (D. Minn. 1996). As the Court has explained, Plaintiffs cannot prove injury here. Moreover, Plaintiffs have not made any allegation of violations of the MDTPA that would enable them to seek relief as a member of the public at large, rather than as participants in a private interaction. See Ly v. Nystrom, 615 N.W.2d 302, 314 (Minn. 2000) (holding that the ability to seek damages under the private attorney general statute "applies only to those claimants who demonstrate that their cause of action benefits the public" and does not apply to plaintiff "in a single one-on-one transaction in which the fraudulent misrepresentation, while evincing reprehensible conduct, was made only to [plaintiff]") (footnote omitted).

Furthermore, Plaintiffs cannot seek injunctive relief because the alleged actions occurred in the past, and there is no evidence of any danger of future similar misconduct by Defendants.  See Cannon Techs., Inc. v. Sensus Metering Sys., Inc., 734 F. Supp. 2d 753, 772 (D. Minn. 2010) (noting that, in order to recover injunctive relief under MDTPA, plaintiffs must allege "prospective conduct").  Plaintiffs have no available remedies, so their claim fails.

Accordingly, based upon the files, records, and proceedings herein**, IT IS HEREBY ORDERED**:

> Defendants' Motion for Summary Judgment [Docket No. 20] is **GRANTED** and this matter is **DISMISSED WITH PREJUDICE**.
>
> **LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:   April 11, 2011                         s/ Michael J. Davis
                                                Michael J. Davis
                                                Chief Judge
                                                United States District Court